**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**TYRONE HENDERSON, SR,**
**GEORGE O. HARRISON, JR., and**
**ROBERT MCBRIDE, on behalf of themselves**
**and others similarly situated,**

        **Plaintiffs,**

**v.**                          **Case No. 3:20-cv-00294-REP**

**THE SOURCE FOR PUBLIC DATA, L.P.,**
**d/b/a PUBLICDATA.COM;**
**SHADOWSOFT, INC.;**
**HARLINGTON-STRAKER STUDIO, INC.;**
**and DALE BRUCE STRINGFELLOW,**

        **Defendants.**

## SECOND AMENDED CLASS ACTION COMPLAINT

Pursuant to the Court's directive (ECF 55), the Plaintiffs, Tyrone Henderson, Sr., George O. Harrison, Jr., and Robert McBride, on behalf of themselves and proposed classes, and for their Complaint against Defendants, they state as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs Henderson, Harrison, and McBride have struggled over the last several years with a game of whack-a-mole, in which each time they apply for a job or face a background check, they are confronted with results that are inaccurate and prevent them from moving forward in their lives. They then dispute or try and correct their file before facing a different background company the next attempt. This Action is a continuing part of that saga and alleges claims under the Federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681a–x for Defendants' furnishing of inaccurate and unauthorized reports and for failing to disclose information required under the statute.

2.      One of the most prolific consumer reporting companies is "PublicData.com", which cost one or more of the Plaintiffs a job. Each Plaintiff has tried to prevent this from happening to them or continuing to happen, each without success.

3.      Defendants—a consumer reporting agency and its principals—have for years engaged in a systematic and unlawful practice of furnishing consumer reports governed by the 50 year old requirements of the FCRA using a business model intentionally designed to appear as if the reports are not so governed. To accomplish such subterfuge, Defendants created a multiple-tiered business structure of shell entities and paper so they could attempt to avoid their grave responsibilities in assembling and providing consumer reports under the FCRA.

4.      At center stage in Defendants' sham business operation is a shell entity known as The Source for Public Data, L.P. d/b/a PublicData.com ("Public Data"), which sells over 50 million consumer reports per year without a *single* employee, office building, or any assets. Instead, Public Data is operated and controlled by and through Dale Bruce Stringfellow and his wholly owned company, ShadowSoft, Inc., who together purchase, assemble, parse, summarize, and format all of the public records and upload them onto Public Data's internet servers without regard for the accuracy or completeness of the consumer report.

5.      To be clear, the term "public records" does not necessarily mean records that are available-to or may be obtained by the public in general. Rather, public records in this context has a more descrete definition—records that originate within a public entity, such as an arm of government like a courthouse.

6.      It is generally understood that not every court record, for example, can be publicly obtained or viewed without specific need or permission.

7.      And companies like Defendants rarely present to their customers court records as they appear at the courthouse sources. Defendants, like most consumer reporting agencies, reformat and alter the court records into a layout or presentation they believe is more user-friendly.

8.      Neither Stringfellow nor ShadowSoft is Public Data's general partner. Instead, the general partner is another corporation wholly owned by Stringfellow named Harlington-Straker Studio, Inc., which Stringfellow dishonestly claims is the decision-making entity for Public Data. Stringfellow, individually, purports to hold a limited partner interest in Public Data even though he is the president and sole director of Harlington-Straker. In reality, both Public Data and Harlington-Straker are sham entities and all of Public Data's business is conducted through Stringfellow and ShadowSoft, which by design did not receive any interest in Public Data or Harlington-Straker.

9.      Because of Defendants' perceived comfort with the purported legal protections afforded by their sham business structure, Public Data admittedly maintains no policies or procedures whatsoever to ensure that it accurately assembles and provides consumer reports in compliance with the FCRA. Instead, Defendants take the absurd legal position that Public Data is not a consumer reporting agency as defined and regulated by the FCRA.

**JURISDICTION AND VENUE**

10.     This Court has federal question jurisdiction over Plaintiffs' FCRA claims pursuant to 28 U.S.C. § 1331.

11.     Venue is proper because Plaintiffs reside in this District and because most events and all damages suffered by them occurred in this District and Division. Two of the Plaintiffs reside in this District and Division. Further, the various information and databases used by Defendants to compile reports regarding Plaintiffs and Virginia class members are all located here, including the Executive Secretary of the Supreme Court of Virginia, which maintains the records for all Virginia General District Courts and Circuit Court records for thirty-one judicial circuits,   the Virginia Department of Corrections, the Virginia State Corporation Commission, the Virginia Department of Motor Vehicles, Virginia's Treasury Department, and nearly all other public record sources located in this Commonwealth.

12.     Additionally, the FCRA violations Plaintiffs assert took place in the Commonwealth of Virginia. Plaintiffs requested that Defendants provide their consumer files from within Virginia, that request was improperly ignored, injuring Plaintiffs by depriving them of their statutorily mandated consumer disclosures in Virginia.

13.     Defendants also issued an inaccurate consumer report about Plaintiff McBride to an employer in Virginia, which inaccuracies caused McBride to improperly lose out on employment in Virginia.

**PARTIES**

14.     Plaintiff Henderson is a "consumer" as protected and governed by the FCRA, and is a member of the putative § 1681g class defined below. Plaintiff Henderson is a resident of Richmond, Virginia.

15.     Plaintiff Harrison is a "consumer" as protected and governed by the FCRA, and is a member of the putative § 1681g class defined below. Plaintiff Harrison is a resident of Henrico County, Virginia.

4

16.     Plaintiff McBride is a "consumer" as protected and governed by the FCRA, and is a member of the putative classes defined below. Plaintiff McBride is a resident of Norfolk, Virginia.

17.     Upon information and belief, Public Data is a foreign limited partnership doing business in Virginia. Public Data's principal office is located at 7750 N. MacArthur Boulevard, Suites 120-290, Irving, TX 75063.   At all times relevant hereto, it was a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). It is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports to third parties. At all times relevant to this case, Public Data was undercapitalized, perpetrating fraud through, and the alternate ego of Stringfellow, ShadowSoft, and Harlington-Straker.

18.     Upon information and belief, ShadowSoft is a foreign corporation doing business in Virginia. ShadowSoft shares a principal office with its alter ego Public Data at 7750 N. MacArthur Boulevard, Suites 120-290, Irving, TX 75063.   At all times relevant hereto, it was a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). ShadowSoft is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers under the guise of Public Data for the purpose of furnishing consumer reports to third parties. At all times relevant to this case, Shadow Soft was undercapitalized, perpetrating fraud through, and the alternative voice of Stringfellow, Public Data, and Harlington-Straker.

19.     Upon information and belief, Harlington-Straker is a foreign corporation incorporated in the State of Texas. Harlington-Straker Studio is the "general partner" and decision-making entity for Public Data and does not engage in any other business outside of

its sham role in Public Data. Harlington-Straker shares a principal office with its alter egos, Public Data and ShadowSoft, at 7750 N. MacArthur Boulevard, Suites 120-290, Irving, TX 75063.  At all times relevant hereto, it was a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). It is regularly engaged in the business of assembling, evaluating, and disbursing information under the guise of Public Data concerning consumers for the purpose of furnishing consumer reports to third parties. At all times relevant to this case, Harlington-Straker was undercapitalized, perpetrating fraud through, and the alternative voice of Stringfellow, Public Data, and ShadowSoft.

20.     Dale Bruce Springfellow is a natural person and "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Stringfellow is the founder and president of Public Data, ShadowSoft, and Harlington-Straker. Stringfellow is the architect and chief executive of the multi-tiered sham business described herein.

21.     Defendants disburse consumer reports to third parties under contract for monetary compensation during the class period and currently.

22.     Defendants operate as a nationwide consumer reporting agency as governed by the FCRA as it assembles public records in reports that contain information that can bear on a consumer's creditworthiness or standing.

23.     Defendants – directed almost exclusively by Defendant Stringfellow – have for many years deliberately availed themselves of the benefits, protections, services and business opportunities in and of the Commonwealth of Virginia.

24.     They have marketed their joint product to Virginia businesses and, upon information belief, they have scores of individuals and businesses from Virginia who have accounts that allow them to access thousands of reports per year. *See, e.g.*, PublicData.com, INDIVIDUAL AND CORPORATE ACCOUNT PLANS, *available at* publicdata.com/prices.html.

25.     And they have marketed their joint product to other businesses when they sought to hire Virginia consumers for jobs in Virginia.

26.     Defendants – Stringfellow and his shell companies – have also set up their business model to regularly and frequently seek out public records from and maintained by the Executive Secretary of the Supreme Court of Virginia, which records are maintained and made available in Richmond, Virginia.

27.     On information and belief, Plaintiffs allege that Defendants have jointly made in excess of $200,000 form the sale of records obtained from the Executive Secretary of the Supreme Court of Virginia.

28.     On information and belief, Plaintiffs allege that Defendants have entered and accessed the records of the Executive Secretary of the Supreme Court of Virginia hundreds of thousands of times.

## FACTS

### The Pervasive Use of Inaccurate Criminal Background Reports for Employment Decisions

29.     Regrettably, Plaintiffs' misfortune is not uncommon. The criminal background screening industry exercises staggering power in hiring decisions. Approximately ninety-three percent of employers procure background checks on employees and job applicants.[1]

---

[1]  *See* National Consumer Law Center, *Broken Records: How Errors by Criminal Background Checking Companies Harm Workers and Businesses* (April 2012), available at http://www.nclc.org/images/pdf/pr-reprts/broken-records-report.pdf.

30.     There are hundreds, if not thousands, of criminal background screening companies. It is a $2 billion a year industry.[2]

31.     Unlike traditional credit reporting, which is dominated by the Big Three credit reporting agencies (Trans Union, Experian, and Equifax), it is nearly impossible for a consumer to verify that his or her criminal background check will be accurate in advance of the report being furnished to an employer because of the numerous different background screening companies. Thus, consumers are routinely denied jobs on the basis of erroneous or inaccurate criminal history reports.

32.     Beyond the risks raised by the sheer volume of the information and players involved in the industry, the manner in which many companies prepare criminal history reports increases the risk of inaccuracies. Companies often purchase criminal data in bulk and in static form, or access databases that are infrequently updated. Online background check companies sell criminal history reports that contain information that is not current or accurate, such as arrests that result in dismissal or felony charges that are reduced to misdemeanor convictions.

33.     Moreover, few public record sources that are easily accessible provide all personal identifiers for the person associated with a record (*e.g.,* date of birth, social security number, or middle name) which causes records to be matched with the wrong consumer. Background check companies often report these mismatched, inaccurate, or incomplete records without any further corroboration or investigation, and often the companies never consult or obtain the original court record.[3]

---

[2] IBISWorld, Inc., *Background Check Services in the US: Report Snapshot* (April 2014), *available at* http://www.ibisworld.com/industry/background-check-services.html.

[3] *See generally* Nat'l Consumer Law Ctr., *Broken Records*, *supra*, at 21-23.

***Stringfellow Begins ShadowSoft and Public Data***

34.     Stringfellow formed ShadowSoft in 1993 as a corporation specializing in public records database distribution.

35.     During its initial stages, Shadowsoft generated revenues exclusively through the sales of compact discs ("CDs") containing public records it purchased directly from the Department of Transportation in Texas.

36.     Due to the evolution of the Internet in the early 1990's, Stringfellow converted Shadowsoft's CD products to more cost effective and accessible databases on the Internet under the domain name of PublicData.com.

37.     During this time, Stringfellow never registered Public Data with the Texas Secretary of State.

38.     Instead, from 1995 until August 1997, Stringfellow operated ShadowSoft and Public Data as one in the same.

39.     However, in August 1997, Defendants officially incorporated Public Data in the British territory of Anguilla because of laws passed by the Texas legislature specifically to prevent Defendants from posting any information obtained from the Department of Transportation without approval from the individual.

40.     Texas state representative Ruth Jones McClendon sponsored the bill after hearing complaints by individuals regarding their personal information on Public Data's site.[4]

---

[4] RAJIV CHANDRASEKARAN, *Doors Fling Open on Public Records*, Wash. Post, at A1 (Mar. 8, 1998) (available at http://www.washingtonpost.com/wp-srv/frompost/march98/privacy9.htm).

41.     Stringfellow announced the move in an e-mail to Public Data's customers on August 18, 1997. In this e-mail, Stringfellow wrote:

> A law passed by the Texas legislature this year banning the distribution of public data records over the Internet has made finding a merchandiser difficult and has made us re-think our position.  I have made the decision that ShadowSoft shall cease operating PublicData.com on August 31, 1997. Because of my own personal belief that keeping public records available to the public in a free society is critical and essential to keeping our country free, ShadowSoft has sold PublicData.com to a company based in Anguilla, British West Indies.  The company which is named PublicData.com.ai Ltd. has purchased all of the programs that ShadowSoft developed which gives you access to the information over the Internet.

42.     In the e-mail, Stringfellow also acknowledged the inseparable connection between Public Data and Shadow Soft, writing:

> ShadowSoft is staffed with the best technical people in the industry but we don't have the skills in the area of marketing. It has been our desire all along to simply be the technical and database contractor for someone who wished to run the business of marketing and merchandising PublicData.com.

43.     The August 18, 1997 email was transmitted from Public Data's "webinfo@publicdata," yet authored by Stringfellow as President of ShadowSoft.

44.     This is the very same email account listed today on Public Data's website as "the easiest way to contact" to contact Public Data.

45.     Public Data not only brazenly admitted to its customers in August 1997 that it purportedly split its companies to evade federal law, Public Data's website previously admitted that it moved its operations to avoid the requirements of federal and state law. In particular, the website previously asserted that Public Data was incorporated outside the United States because of the government's agenda against companies "making access to public records easy and inexpensive" and its initiative "to confront those who did so with threats of prosecution and civil penalties."

10

46.     Stringfellow further confirmed the reason for Public Data's move to Anguilla in a deposition on February 13, 2013, where he testified:

> Q.  And why – why was it incorporated in Anguilla?
>
> A.  The – aforementioned Driver Policy Protection Act, it was either happening or it was in the process of happening legislatively. And we could not get our hands around legally whether driver's license and motor vehicles could legally under certain definitions be on the Internet.

47.     Upon information and belief, despite its incorporation in Anguilla, Stringfellow continued to run Public Data through records purchased and assembled by ShadowSoft throughout the United States.

### *Allegations Regarding Defendants' Current Sham Business Structure*

48.     After almost seven years in Anguilla, Defendants moved Public Data into the United States in December 2004 and expanded their business model to include other personal information, including criminal and civil records, voting records, and professional license information.

49.     In lieu of implementing policies and procedures for complying with the federal and state laws, such as the FCRA, Defendants created their sham business structure to ostensibly avoid legal ramifications to their unlawful business.

50.     To that end, Stringfellow formed Harlington-Straker as a Texas corporation on December 22, 2004.

51.     On the very next day, Stringfellow officially registered Public Data as a limited partnership with one general partner, Harlington-Straker. Public Data also has three limited partners: Michael Mitchell, Paul Jordan, and Stringfellow.

52.     Harlington-Straker is a closely held corporation owned entirely by Stringfellow and his wife, Pamela Stringfellow. Stringfellow is also the President of Harlington-Straker and its sole officer according to the records of the Texas Secretary of State and his deposition testimony.

53.     According to Stringfellow's deposition testimony, Harlington-Straker "is the decision-making entity for the limited partnership," and does not engage in any other business than its role in Public Data. *See* Stringfellow Dep. 31: 2-7 (Feb. 13, 2013).

54.     Upon information and belief, Harlington-Straker does not hold any assets despite its ownership in Public Data, which sells over fifty million consumer reports per year.

55.     Public Data also does not hold any assets according to the deposition testimony of Stringfellow.

56.     In fact, Public Data does not even have office space in Irving, Texas, or anywhere else throughout the United States.

57.     Moreover, Public Data does not have a single employee, yet generates annual revenue of approximately ten million dollars.

### *Stringfellow, through ShadowSoft, Continues to Control and Operate Public Data*

58.     Public Data is operated by Stringfellow through ShadowSoft, who purchases and assembles the public records and then publishes them on Public Data's server.

59.     By way of example, on December 29, 2008, ShadowSoft entered into the Memorandum of Understanding ("MOU") to acquire driver's license information from the Florida Department of Highway and Motor Vehicles.

60.     The purpose of the MOU was to establish the conditions and terms by which ShadowSoft would obtain new additions, deletions, and changes to driver's licenses within the state of Florida, including the $.01 amount paid by ShadowSoft per transaction.

61.     As part of the MOU, ShadowSoft was required to certify its use of the information as provided by Florida law and the Driver's Privacy Protection Act.

62.     In doing so, Stringfellow, as the President of ShadowSoft, certified that he was "a representative of an organization requesting personal information for one or more records . . . I declare that my organization is qualified to obtain personal information under exception number 4, as listed on the reverse side of this form."[5]

63.     Stringfellow further wrote: "ShadowSoft is a contractor for PublicData.com. ShadowSoft will insure Public Data's and its Customer's DPPA exception declaration compliance. Public Data will be using the provided data under DPPA exception 4 to verify the identity of its Customers."

64.     However, this information was not obtained by ShadowSoft to assist Public Data in verifying the accuracy of personal information submitted by an individual to Public Data.

65.     Instead and representative of thousands of similar transactions, ShadowSoft obtained the information from the MOU for the sole purpose of uploading these records on Public Data's server to sell them to its customers.

66.     ShadowSoft's primary and only business function involves purchasing, collecting, and assembling the information contained on Public Data's servers.

---

[5] Exception #4 states that the information will be used "in the normal course of business by a legitimate business or its agents, employees, or contractors, but only: (a.) [t]o verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors…".

67.     In fact, despite maintaining its own website, the sole function of ShadowSoft's website is to promote the business of Public Data. In particular, the website states:

> ShadowSoft is no longer manufacturing its Public Information CD products. Distributing Public Records information via the Internet is much more cost effective and provides the most current information available.
> …
>
> ShadowCriminal – If you enjoyed this product, you will really like PublicData.com.
>
> ShadowCivil – If you enjoyed this product, you will really like PublicData.com.
>
> ShadowVoter – If you enjoyed this product, you will really like PublicData.com. Unfortunately, PublicData.com does not currently have the ability to print mailing labels, you can contact the Dallas and Tarrant Voter Register and buy a copy of the voter roll on CD.[6]

68.     Thus, ShadowSoft and Stringfellow use the name Public Data as a sham device to disguise Defendants' complete and utter disregard for the FCRA.

69.     Upon information and belief, Public Data does not keep separate books from ShadowSoft and uses funds from ShadowSoft and Stringfellow's accounts to pay its corporate debts. Moreover, upon information and belief, Public Data does not hold separate corporate meetings from Stringfellow and ShadowSoft.

70.     Upon information and belief, Harlington-Straker does not keep separate books from Public Data and uses funds from ShadowSoft and Stringfellow's accounts to pay its corporate debts. Moreover, upon information and belief, Harlington-Straker does not hold separate meetings from Public Data and ShadowSoft.

---

[6] http://www.shadowsoft.com/ShadowCDs.htm (last visited September 4, 2019).

71.     Moreover, Harlington-Straker was ostensibly created to shield Stringfellow, ShadowSoft, and the other limited partners from personal liability for ShadowSoft and Public Data's complete and utter disregard for the FCRA.

72.     In fact, Defendants' own website disclaims: "Please be aware that many US lawmakers have made certain access to Public Records illegal and it is your responsibility to be aware of which Public Records you may view legally."[7]

73.     Public Data, ShadowSoft, and Harlington-Straker all maintain the same principal address, which is a rented mailbox at a UPS Store located at 7750 North Macarthur Boulevard, Suite #120, Irving, Texas 75063-7514.

74.     Upon information and belief, Public Data, ShadowSoft, and Harlington-Straker are also undercapitalized and do not retain any of the revenues generated by Public Data's sale of consumer reports.

75.     Public Data, ShadowSoft, and Harlington-Straker also use the same telephone number of (972) 869-2471.

### Defendants are a Consumer Reporting Agency Governed by the FCRA

76.     Because of this multi-tiered business structure that ostensibly shields the two participants with assets (*i.e.*, Stringfellow and ShadowSoft), Public Data altogether ignores the requirements of the FCRA imposed on credit reporting agencies.

77.     Instead, Defendants claim "PublicData.com is not a consumer reporting agency and data provided by PublicData.com does not constitute a credit report as the term is defined in the Fair Credit Reporting Act, 15 U.S.C.A. sec 1681 et seq."[8]

---

[7] http://publicdata.com (last visited August 11, 2020).
[8] http://publicdata.com/DisplayTC.html (last visited September 4, 2019).

78.     Defendants' position disregards the plain language of the FCRA, which defines a "consumer reporting agency" as:

> [A]ny **person**[9] which, **for monetary fees**, dues, or on a cooperative nonprofit basis, **regularly engages** in whole or in part **in the practice of assembling** or evaluating consumer credit information or **other information on consumers for the purpose of furnishing consumer reports to third parties**, and which uses any means or facility **of interstate commerce for the purpose of preparing** or furnishing consumer reports.

15 U.S.C. § 1681a(f) (emphasis added).

79.     As demonstrated above, Defendants encompass the definition of a credit reporting agency because (1) in exchange for compensation; (2) Defendants regularly assemble information on consumers; (3) for the purpose of furnishing consumer reports; and (4) by means of interstate commerce.

80.     As to the first element, there is no dispute that Defendants receive compensation from their customers. In fact, Defendants clearly anticipate businesses to access this information on a regular basis, as it has corporate plans that provide for up to 5,700 lookups a month. *See, e.g.*, Public Data, *PublicData.com Pricing Plains*, available at http://www.publicdata.com/prices.html (last visited September 4, 2019).

81.     Second, Defendants purchase and assemble their data from the "local, state or federal authority or from businesses who purchased the information."[10]

82.     Defendants then parse that information, altering it into an original, proprietary format such that it can more-easily meet what it perceives to be its clients' needs.

---

[9] Person is defined as "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." 15 U.S.C. § 1681a(b).

[10] http://www.publicdata.com/info.html (last visited September 4, 2019).

83.    As Public Data notes on its website:

> Advanced Search is finally here! Have you ever had trouble finding a certain individual or business name on PublicData.com because you didn't know the exact format used? Have you ever needed to search on multiple criteria, like NAME and ADDRESS? Advanced Search was created to provide these capabilities (and much more). Enter as much information as you know, and records that match the most information will be at the top of the search results list. Advanced Search allows PublicData.com capabilities similar to popular search engines (i.e. Google, Yahoo, etc). It will take us some time to convert the thousands of databases available on PublicData.com to the new format, but we will be adding Advanced Search to more databases as rapidly as possible.

84.    The reports Defendants create confirm that it manipulates the public-record data it obtains into a different, summarized format for reporting to customers. Instead of providing full details of the criminal-history entries it furnishes, Defendants distill criminal-history information into glib statements such as those it reported for Plaintiff McBride—"POSSESSION OF PARAPHERNALIA," "POSSESS-NOT MARIJUANA," and "POSSESSION-MARIJUANA."

85.    In placing criminal history in their original format for reporting, Defendants strip out or suppress all identifying information relating to the charges; the states, counties, or courts from which they originate; case numbers; dispositions; the originating courts' actual statements of the nature of the charges; and virtually anything else that would confirm that such records originated in a court at all.

86.    Defendants then replace this information with their own internally created summaries of the charges, bereft of any detail, as they did with Plaintiff McBride.

87.    Additionally, Defendants actively curate the records to match – in Defendants' own view – the request information provided by the employer. Defendants' customers do not merely search for specific records, but instead ask a general question: "Are there any criminal convictions anywhere that match this applicant, with this personal identifying information?" Because that information often does not match or does not provide sufficient information to match records, Defendants affirmatively sort, manipulate and infer information to adapt data results to the requests received.

88.     In essence, Defendants re-write the court records into their own, original entries into their reports.

89.     Third, Defendants obtain and assemble the information for the purpose of providing it to third parties, who then obtain and use the information from Defendants' website in order to determine a consumer's eligibility for credit, insurance, or employment.

90.     Defendants have actual knowledge that its customers use the website and Defendants' data for FCRA purposes.

91.     Public Data's website details the variety of information it permits users to view, all of which is parsed and limited rather than simply a snapshot of what appears in the original records:

> From the search results list, each line is clickable, yielding the detail for that item. Within the detail screen, some informational fields may be further clickable to provide additional information. In some cases, addresses are indexed and may be clicked to show other records with matching address criteria with the same database. Each viewed detail screen counts as a Look-up.

92.     Fourth, Defendants utilize multiple means of interstate commence to sell their reports, which are disbursed to prospective employers around the nation. Further, Defendants obtain their public records from vendors, state agencies, and courthouses in all 50 states and then resell this information in all 50 states.

93.     Defendants' attempts to circumvent FCRA governance are also ineffective as the statute prohibits the attempted use of corporate structures, ownership restructuring and comparable legal tricks as a way to avoid being characterized as a consumer reporting agency.  *See, e.g.*, 12 C.F.R. § 1022.140.

### *Defendants Willfully Violate the FCRA*

94.     Defendants are no exception to the industrywide abuses detailed above. For example, there have recently been several cases brought against Defendants for publishing inaccurate and/or incomplete public records and criminal information about consumers who

suffered adverse employment actions. *See, e.g.*, *Horton v. The Source for Public Data, L.P.*, No. 1:14-cv-230 (E.D. Va.) (complaint filed by 2 different individuals subject to Defendants' reports); *Jones* v. *The Source for Public Data, L.P.*, No. 6:15-cv-01637 (M.D. Fla.) (complaint filed by 20 different individuals subject to Defendants' reports).

95.     Based on these cases, as well as government enforcement actions brought by the Consumer Financial Protection Bureau ("CFPB"), Defendants knew or should have known about their legal obligations under the FCRA. These obligations are well established in the plain language of the FCRA and in the promulgations of the FTC and the CFPB.

96.     Additionally, Defendants obtained or had available substantial written materials that apprised them of their duties under the FCRA, including lawsuits filed in Arkansas, Missouri, and Texas.

97.     Despite knowing of these legal obligations, Defendants acted consciously in breaching their known duties and deprived Plaintiffs and other members of the classes of their rights under the FCRA.

98.     Plaintiffs allege that Defendants' conduct as alleged herein was consistent with their established and systematically executed procedures and policies to willfully disregard their obligations to comply with the FCRA.

99.     For example, PublicData's own website states:

PublicData is a public records disseminator and **is not responsible for any inaccuracies in any database**. PublicData will not modify records in any database upon notification of inaccuracies from individuals.

http://publicdata.com/PandP.html (last visited September 4, 2019) (emphasis added).

100.    It further states:

Please do not send *expungement orders*. PublicData has received so many counterfeit expungement documents that our current established policy is to

rely solely on complete database updates from the recording government entity.

http://publicdata.com/faq.html (last visited September 4, 2019).

101.    Defendants' complete disregard for the FCRA is further evidenced by the February 13, 2013 deposition testimony of Stringfellow as the Fed. R. Civ. P. 30(b)(6) corporate representative for Public Data, where he testified Public Data does not have any policies in place designed to specifically comply with the requirements of the FCRA. Specifically, the following exchanged occurred:

> Q. PublicData doesn't have any policies in place designed specifically to comply with the Fair Credit Reporting Act?
>
> A. That is correct.

Stringfellow Dep. 42:11–14 (Feb. 13, 2013).

102.    In short, Defendants admittedly do not have in place and did not follow any procedure to: (1) ensure that they furnish an accurate and complete status of the public record as required by 15 U.S.C. § 1681k; (2)restrict the furnishing of consumer reports to be used for an employment purpose when the user has not certified to compliance with  15 U.S.C. § 1681b(b)(1); and (3) to provide, upon a consumer's request, a copy of the consumer file, required by 15 U.S.C. § 1681g.

103.    Defendants continue this practice of failing to even attempt to comply with the FCRA despite the clear requirements of the statute and notice from other lawsuits about their failure to comply with its provisions.

104.    Upon information and belief, Defendants do not intend to comply with the FCRA because doing so would drastically increase their operating expenses. Instead, upon

information and belief, Defendants intentionally choose to not comply with the FCRA in order to keep their costs low, which in turn generates substantial profits for Stringfellow.

105.     While Defendants have shown their intent to rely on the immunity provided to Internet-message boards and Facebook, the Communications Decency Act ("CDA"), 47 U.S.C. § 230, there is not a single case applying such immunity to an entity alleged or proven to have been a CRA and governed by the FCRA.

106.     The existence of such arguments certainly would not prohibit a finding that Defendants acted willfully, particularly given the timing of such decisions.

107.     The one court to consider the defense in a context like this one, *Liberi v. Taitz*, No. SACV110485AGAJWX, 2011 WL 13315691, at *10 (C.D. Cal. Oct. 17, 2011), conducted its analysis by first "assum[ing] that the Defendants [some of which were LexisNexis-affiliated entities] are not credit reporting agencies."

108.     The *Liberi* court noted the tension between asserting common-law claims like defamation and those under the FCRA for inaccurate reporting against the immunity the CDA allows:

> If the Plaintiffs allege that the Reed and Intelius Defendants are credit reporting agencies, as in the current FAC, Plaintiffs' claims are largely barred under the FCRA and CCRA. If Plaintiffs amend their pleading and claim that the Reed and Intelius Defendants are *not credit reporting agencies*, their claims are largely barred under the CDA.

*Id.* at *12 (emphasis added).

109.     The *Liberi* court declined to apply the CDA's immunity and grant defendants' motions to dismiss plaintiffs' claims brought pursuant to the FCRA. *Id.*

110.     Along this line of decisions, one of the cases Defendants have cited in their briefing as applying CDA immunity to "publishers of public records and reports like

LexisNexis," *Merritt v. LexisNexis Screening Sols., Inc.*, No. 13-CV-10768, 2013 WL 3242952, at *4 (E.D. Mich. June 26, 2013), was a case in which the plaintiff did not allege any FCRA claims.

111.     That case was decided on a motion to dismiss the complaint of a *pro se* plaintiff who did not file a response to the motion. *Id.* at *1.

112.     These decisions make sense in the larger scheme of Federal legislation. Defendants' arguments for CDA immunity would eliminate application of the FCRA wholesale to virtually any CRA that operates a website. Such a wildly unbalanced and unexpected outcome surely cannot have been in Congress's mind when it enacted the CDA.

### Factual Allegations Relating to Plaintiffs

113.     Plaintiff Henderson has suffered a longstanding problem with the background check system wherein consumer reporting agencies – unable to obtain full identifying information with their public records – mixed Henderson with a similarly named stranger in Pennsylvania.  That faux-Henderson has a criminal history.

114.     Repeatedly, Henderson applied for positions and was denied same based on his inaccurate but purported felony history. This has continued even today and even after extensive litigation on the same factual and legal issues in other cases before this Court.

115.     Accordingly, Henderson has tried to prevent and/or correct this recurring problem by contacting major consumer reporting companies before he faces further rejection and embarrassment from an employer.

116.     On or about December 11, 2019 and February 12, 2020, Plaintiff Henderson requested a copy of his full file from Defendants by U.S. Mail. Plaintiff Henderson requested the file because in the past other consumer reporting agencies had reported

inaccurate information about him, resulting in the loss of employment opportunities. Plaintiff Henderson also requested his full file from Defendants in an effort to proactively determine what information was contained in his file and to correct any inaccuracies, to ensure that he would not have problems in the future with securing employment. Plaintiff Henderson is entitled to a copy of his file pursuant to § 1681g. Defendants did not respond to Plaintiff Henderson's request. By failing to comply with Plaintiff Henderson's request, Defendants violated § 1681g.

117.    On or about March 12, 2020, for a third time Plaintiff Henderson requested a copy of his full file from Defendants by U.S. Mail. Defendants did not themselves respond to Plaintiff Henderson's request, but had an attorney write with a statement that Defendants are not governed by the FCRA. The attorney claimed that there was no record regarding Henderson, without any explanation and did not provide any of the information required by § 1681g.

118.    On or about December 19, 2019, Plaintiff Harrison requested a copy of his full file from Defendants by U.S. Mail. Plaintiff Harrison requested the file because in the past other consumer reporting agencies had reported inaccurate or obsolete information about him, resulting in the loss of employment or rental opportunities. Plaintiff Harrison also requested his full file from Defendants in an effort to proactively determine what information was contained in his file and to correct any inaccuracies, in order to ensure that he would not have problems in the future with securing employment or housing. Plaintiff Harrison is entitled to a copy of his file pursuant to § 1681g.  Defendants did not respond to Plaintiff Harrison's request. By failing to comply with Plaintiff Harrison's request, Defendants violated § 1681g.

119.    On or about February 26, 2019 and January 24, 2020, Plaintiff McBride requested a copy of his full file from Defendants by U.S. Mail. Plaintiff McBride requested his full file from Defendants in an effort to determine what information was contained in his file and to correct the inaccuracies, in order to ensure that he would not have problems in the future with securing employment. Plaintiff McBride is entitled to a copy of his file pursuant to § 1681g. Defendants did not respond to Plaintiff McBride's request.  By failing to comply with Plaintiff McBride's request, Defendants violated § 1681g.

120.    In August 2016, Plaintiff McBride applied for a surveyor position to be located in Virginia. As part of the application process, Plaintiff McBride completed a lengthy application over the internet.

121.    The job was contingent upon a background check.

122.    Plaintiff McBride's potential employer contacted Public Data and paid it for information from its database. Plaintiff McBride's potential employer uses Defendant Public Data's databases to perform background checks on potential employees, like Plaintiff McBride.

123.    Defendants furnished the background report to Plaintiff McBride's potential employer.[11]

124.    The background report included numerous entries described as Plaintiff McBride's criminal record, suggesting that Plaintiff McBride had been convicted of each of

---

[11] Because Defendants failed to comply with § 1681k, Plaintiff McBride did not learn of Defendants' violation until discovery commenced in his litigation against his potential employer, well after August 7, 2018. Because the FCRA expressly includes a discovery rule—allowing for the filing of a case with "2 years of the date of discovery of the violation"—this case has been timely filed. 15 U.S.C. § 1681p.

the offenses listed.  In fact, the report was inaccurate and incomplete as it failed to indicate that several of the offenses listed had been nolle prossed.

125.    The background report is a consumer report as governed and defined by the FCRA.

126.    Plaintiff McBride's potential employer received and utilized Defendants' report, in whole or in part, to make its decision to deny Plaintiff McBride's employment.

127.    After accessing Plaintiff McBride's consumer report from Public Data, Plaintiff McBride's potential employer denied his application for employment.

128.    Plaintiff McBride never received any communications from the Defendants "at the time" the report was furnished.

129.    Despite providing a report for employment purposes containing criminal conviction information likely to have an adverse effect upon their ability to obtain or maintain employment, Defendants failed to provide notice "at the time" of the fact that the criminal conviction information was being reported by it, together with the name and address of the person(s) to whom such information was being reported.

130.    On information and belief, Plaintiff McBride alleges that Defendants did not attempt for any consumer to follow the option available at 15 U.S.C. § 1681k(a)(2), which requires a consumer reporting agency to actually contact the original source of public records information (e.g., the complete record from the Executive Secretary of the Supreme Court of Virginia or the court clerk) immediately before furnishing a report which includes such information. Title 15 U. S.C. § 1681k(a)(2) is thus inapplicable to the consumer reports at issue in this case.

131.    Defendants' failure to follow reasonable procedures to assure that their report regarding Plaintiff McBride was a substantial factor in the rejection of Plaintiff McBride's employment offer and other related actual harm he suffered.

## CLASS ACTION ALLEGATIONS

132.    Plaintiffs Henderson, Harrison and McBride assert their claim in Count One on behalf of a putative class of Virginia consumers initially defined as (the "§ 1681g Class"):

> All natural persons residing in Virginia who requested a copy of their consumer file from Defendants at any time from the date two years prior to the filing of this Complaint and continuing through the resolution of this case.

> Excluded from the class definition are any employees, officers, directors of Defendants, any attorney appearing in this case, and any judge assigned to hear this action.

> Plaintiffs Henderson, Harrison and McBride are members of the § 1681g Class.

133.    Plaintiff McBride asserts his claim in Count Two on behalf of a putative class of Virginia consumers initially defined as (the "§ 1681k Class"):

> All natural persons residing in Virginia (a) who were the subject of a report sold by Public Data to a third party, (b) that was furnished for an employment purpose, (c) that contained at least one public record of a criminal conviction or arrest, civil lien, bankruptcy or civil judgment (d) within five years preceding the filing of this action and during its pendency, and (e) to whom Defendants did not place in the United States mail postage pre-paid, on the day it furnished any part of the report, a written notice that it was furnishing the subject report and containing the name of the person that was to receive the report.

> Excluded from the class definition are any employees, officers, directors of Defendants, any attorney appearing in this case, and any judge assigned to hear this action.

> Plaintiff McBride is a member of the § 1681k Class.

134.    Plaintiff McBride asserts his claim in Count Three on behalf of a putative class of Virginia consumers initially defined as follows (the "1681b(b)(1) Class"):

> All natural persons residing in Virginia (a) who were the subject of a report sold by Public Data to a third party that contained a derogatory record, (b) that was furnished for an employment purpose, (c) without Defendants first receiving the certifications required at 15 U.S.C. § 1681b(b)(1) and (d) within five years preceding the filing of this action and during its pendency.

> Excluded from the class definition are any employees, officers, directors of Defendants, any attorney appearing in this case, and any judge assigned to hear this action.

> Plaintiff McBride is a member of the § 1681b(b)(1) Class.

135.    **Numerosity.** FED. R. CIV. P. 23(a)(1). The Class members are so numerous that joinder of all is impractical. The names and addresses of the Class members are identifiable through documents maintained by Defendants, and the Class members may be notified of the pendency of this action by published and/or mailed notice.

136.    **Existence and Predominance of Common Questions of Law and Fact.** FED. R. CIV. P. 23(a)(2). Common questions of law and fact exist as to all members of the Classes. Without limitation, the total focus of the litigation will be Defendants' uniform conduct and procedures, whether Defendants sent the required notices, when they did so and whether Defendants acted willfully in their failure to design and implement procedures to assure compliant delivery and/or timing of these notices and to assure that their records are accurate. Even the appropriate amount of uniform statutory and/or punitive damages under 15 U.S.C. § 1681n is a common question.

137.    **Typicality.** FED. R. CIV. P. 23(a)(3). Plaintiffs' claims are typical of the claims of each Class member. The FCRA violations suffered by Plaintiffs are typical of those suffered by other putative class members, and Defendants treated the Plaintiffs

consistently with other putative class members in accordance with their standard policies and practices.

138.   **Adequacy.** Plaintiffs are adequate representatives of the Classes because their interests coincide with, and are not antagonistic to, the interests of the members of the Classes each seek to represent, each has retained counsel competent and experienced in such litigation, and each intends to prosecute this action vigorously. Plaintiffs and their Counsel will fairly and adequately protect the interests of members of the Classes.

139.   **Superiority.** Questions of law and fact common to the Class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. FED. R. CIV. P. 23(b)(3). The statutory and punitive damages sought by each member are such that individual prosecution would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for the members of the Classes individually to redress effectively the wrongs done to them. Even if the members of the Classes themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

**COUNT ONE:**
**VIOLATION OF THE FCRA 15 U.S.C. § 1681g**
**(Class Claim)**

140.    Plaintiffs Henderson, Harrison and McBride allege and incorporate by reference the allegations in the preceding paragraphs.

141.    Plaintiffs Henderson, Harrison and McBride each requested a copy of their consumer files from Defendants.

142.    Defendants failed to produce the information they possessed regarding Plaintiffs Henderson, Harrison and McBride and each other member of the § 1681g Class, despite each consumer's valid request for a copy of his or her file pursuant to § 1681g(a). They also failed to provide Plaintiffs Henderson, Harrison and McBride and each other member of the § 1681g Class notice of his or her rights under the FCRA, as required by § 1681g(c)(2).

143.    The conduct, action, and inaction of Defendants was willful, rendering Defendants liable for statutory and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

144.    As a result of Defendants' conduct, Plaintiffs Henderson, Harrison and McBride and the putative class have suffered particularized and concrete injuries, including being robbed of their congressionally mandated right to information to which Congress has deemed consumers entitled. Access to this information is important because (1) it is highly personal in nature, (2) it is maintained and reported by third parties with whom Plaintiffs have no pre-existing relationship, (3) it is ultimately sold to third parties to whom Plaintiffs are applying to employment or credit without Plaintiffs having the opportunity to view it in advance, (4) it is potential determinative information in extremely important interactions –

applications for employment or credit, and (5) it should include a notice of the consumer's substantive rights under applicable federal law.

145.    Having been denied this important information, Plaintiffs Henderson, Harrison and McBride and the putative class were harmed because they did not know what information was circulated about them and were subsequently denied an opportunity to correct inaccurate or obsolete information. As a result, Plaintiffs Henderson, Harrison and McBride were at increased risk to be denied employment.

146.    Plaintiffs Henderson, Harrison and McBride and other members of the Class are entitled to recover costs and attorney's fees as well as appropriate equitable relief from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

147.    As a result of these FCRA violations, Defendants are liable to Plaintiffs Henderson, Harrison and McBride, and to each Class Member for statutory damages from $100.00 to $1,000.00 pursuant to 15 U.S.C. § 1681n(a)(1)(A), plus punitive damages pursuant to 15 U.S.C. § 1681n(a)(2), and for attorney's fees and costs pursuant to § 1681n.

**COUNT TWO:**
**VIOLATION OF THE FCRA 15 U.S.C. § 1681k(a)**
**(Class Claim)**

148.    Plaintiff McBride alleges and incorporates by reference the allegations in the preceding paragraphs.

149.    Defendants' failure to timely provide the FCRA notice required at 15 U.S.C. § 1681k(a)(1) to Plaintiff McBride and other members of the putative class and the putative subclass violated 15 U.S.C. § 1681k(a)(1).

150.    Defendants did not attempt to comply with any alternate provision of the section and were thus required to comply with the default requirement. To the extent it

claims otherwise, it failed to do so as it did not furnish the complete and up to date public records regarding any class member.

151.    As explained above, the foregoing violations were willful. Defendants acted in deliberate or reckless disregard of their obligations and the rights of Plaintiff McBride and other putative class members under 15 U.S.C. § 1681k(a)(1).

152.    Plaintiff McBride and the putative class are entitled to statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations, and punitive damages, pursuant to 15 U.S.C. § 1681n.

153.    Plaintiff McBride and the putative class are further entitled to recover their costs and attorneys' fees, pursuant to 15 U.S.C. § 1681n(a)(3).

**COUNT THREE:**
**VIOLATION OF THE FCRA § 1681b(b)(1)**
**(Class Claim)**

154.    Plaintiff McBride alleges and incorporates by reference the allegations in the preceding paragraphs.

155.    Defendants' intentional and systemic failure to obtain the certifications required at 15 U.S.C. § 1681b(b)(1) before it furnished employment background check information violated § 1681b.

156.    As a result of Defendants' conduct, Plaintiff McBride and the putative class have suffered particularized and concrete injuries, including being robbed of their congressionally mandated right to information to which Congress has deemed consumers entitled. Access to this information is important because (1) it is highly personal in nature, (2) it is maintained and reported by third parts with who Plaintiffs have no pre-existing relationship, (3) it is ultimately sold to third parties to whom Plaintiffs are applying to

employment or credit without Plaintiffs having the opportunity to view it in advance, (4) it is potential determinative information in extremely important interactions – applications for employment or credit, and (5) it should include a notice of the consumer's substantive rights under applicable federal law. They also had a recognized privacy right to restrict the dissemination of public records information about them and suffered concrete harm when they were denied that right.

157.    As explained above, the foregoing violations were willful. Defendants acted in deliberate or reckless disregard of their obligations and the rights of Plaintiff McBride and other putative class members under 15 U.S.C. § 1681b(b)(1).

158.    Plaintiff McBride and the putative class are entitled to statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations, and punitive damages, pursuant to 15 U.S.C. § 1681n.

159.    Plaintiff McBride and the putative class are further entitled to recover their costs and attorneys' fees, pursuant to 15 U.S.C. § 1681n(a)(3)

**COUNT FOUR:**
**VIOLATION OF THE FCRA 15 U.S.C. § 1681e(b)**
**(Individual Claim)**

160.    Plaintiff McBride alleges and incorporates by reference the allegations in the preceding paragraphs.

161.    Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report they furnished regarding Plaintiff McBride.

162.    As a result of this conduct, Plaintiff McBride suffered actual damages, including without limitation, by example only and as described herein on his behalf by

counsel:  loss of employment, damage to reputation, embarrassment, humiliation and other emotional and mental distress, aggravating an existing mental health condition which resulted in physical symptoms and injuries.

163.   Defendants' violations of 15 U.S.C. § 1681e(b) were willful, rendering Defendants liable pursuant to 15 U.S.C. § 1681n. In the alternative, the Defendants were negligent entitling Plaintiff McBride to recover under 15 U.S.C. § 1681o.

164.   Plaintiff McBride is entitled to recover actual damages and/or statutory damages, punitive damages, costs and attorney's fees from the Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

**WHEREFORE**, the Plaintiffs demand judgment for actual, statutory and punitive damages against the Defendants on McBride's individual claim; for certification of each putative class pursuant to Fed. R. Civ. P. 23(b); for judgment for statutory and punitive damages against Defendants on each class claim; for attorneys' fees and costs, for pre-judgment and post-judgment at the legal rate, and such other relief the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs and the putative classes demand a trial by jury.

**TYRONE HENDERSON, GEORGE O. HARRISON, JR. and ROBERT MCBRIDE,** *on behalf of themselves and others similarly situated*

By Counsel

      */s/ Leonard A. Bennett*
Leonard A. Bennett, VSB #37523
Craig C. Marchiando, (VSB #89736)
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, Virginia 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
E-mail: lenbennett@clalegal.com
E-mail: craig@clalegal.com

Kristi Cahoon Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
**KELLY GUZZO, PLC**
3925 Chain Bridge Rd, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-9285
E-mail: kkelly@kellyguzzo.com
E-mail: aguzzo@kellyguzzo.com

Dale W. Pittman, VSB #15673
**THE LAW OFFICE OF DALE W. PITTMAN, P.C.**
112-A W Tabb Street
Petersburg, VA 23803-3212
Telephone: (804) 861-6000
Fax: (804) 861-3368
Email: dale@pittmanlawoffice.com

*Counsel for the Plaintiffs*